MARITIME VENTURES
INTERNATIONAL,
INC., Plaintiff,

v.

CARIBBEAN TRADING & FIDELITY,
LTD., et al, Defendants.

No. 85 Civ. 6238 (WCC).

United States District Court,
S.D. New York.

June 27, 1988.

---

22. *See Tedesco v. Mishkin*, 629 F.Supp. 1474 (S.D.N.Y.1986).

Nourse & Bowles, New York City, for plaintiff Maritime Ventures International, Inc.; Lawrence J. Bowles, Shaun F. Carroll, of counsel.

Sylvor, Schneer, Gold & Morelli, New York City, for defendants Caribbean Trading & Fidelity, Ltd., Michael Z. Matthew and Alberto de Paulo; Iris S. Richman, of counsel.

Healy & Baillie, New York City, for defendant Federation of St. Christopher & Nevis; John D. Kimball, Richard V. Singleton, of counsel.

Zave M. Unger, New York City, for defendant Marvin Douglas; Zave M. Unger, Mark J. Kurzmann, of counsel.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge.

This is an admiralty action arising out of a contract of charter party between plaintiff Maritime Ventures International, Inc. ("Maritime"), the owner of the vessel Senhorita, and defendant Caribbean Trading & Fidelity, Ltd. ("Caribbean"). Maritime seeks to recover $346,915.17 in demurrage charges, which it claims accrued under the charter party due to the detention of the Senhorita at Bonny, Nigeria between July 15 and August 17, 1985. Maritime also asserts a claim of fraud.

Pursuant to Supplemental Admiralty Rule B(1), Fed.R.Civ.P., plaintiff obtained a maritime attachment and garnishment against the assets of Caribbean, Michael Z. Matthew, and Alberto de Paulo. Plaintiff also obtained an attachment against Matthew under article 62 of the New York Civil Practice Laws and Rules (McKinney 1980 & Supp.1988) ("CPLR").

Except for Caribbean, all defendants have moved to dismiss pursuant to Rule 12(b)(6), Fed.R.Civ.P. Defendants Marvin Douglas and the Federation of St. Christopher & Nevis ("St. Kitts") have moved to dismiss on jurisdictional grounds as well.

In the event that the complaint is not dismissed, Matthew and de Paulo have moved pursuant to Rules 8 and 9(b), Fed.R. Civ.P., for an order requiring a more defi-

nite statement of any causes of action that the Court sustains. They have also moved to vacate the attachments and garnishments levied on their property. In addition, they seek the imposition of costs and attorneys' fees pursuant to Rule 11, Fed.R. Civ.P.

Plaintiff has cross-moved for an order pursuant to Rule 15(a), Fed.R.Civ.P., permitting plaintiff to amend its complaint to name additional defendants, and to state a cause of action against all current and proposed defendants as joint venturers. Plaintiff seeks an order pursuant to § 8 of the Arbitration Act,[1] and Supplemental Admiralty Rule B(1), attaching all property of these proposed additional defendants, and an order pursuant to §§ 4 & 5 of the Arbitration Act,[2] directing all defendants, including the proposed defendants, to proceed to arbitration with plaintiff in New York. In addition, plaintiff has cross-moved pursuant to Rules 11 and 37(d), Fed. R.Civ.P., for an order granting the following relief: (1) precluding defendants from submitting further evidence on the ownership of the funds in de Paulo's account at Banque Paribas, New York, (2) directing that the funds be deemed those of defendant Caribbean, and (3) further directing all defendants to pay plaintiff its costs and attorneys' fees.

St. Kitts has asserted a cross-claim against defendants Marvin Douglas, Michael Z. Matthew, Alberto de Paulo and Caribbean. Douglas has moved for an order dismissing the cross-claim.

For the reasons set forth below, the motions to dismiss are denied in part and granted in part. Plaintiff's motion to amend its complaint to state a cause of action based on a joint venture theory, and to add additional defendants is granted. The cross-motions for sanctions are denied. The Court will conduct a trial to determine whether to compel defendants to arbitrate.

## I. *Background*

The dispute in this case concerns the breach of a charter party between the plaintiff Maritime, and the defendant, Caribbean. The charter party covered the transportation of a shipment of crude oil aboard the Senhorita from Bonny, Nigeria, to a safe harbor on the Atlantic or Gulf Coast of the United States.

The Senhorita is a Liberian flag vessel owned by Maritime, a Panamanian corporation. Caribbean is a limited liability corporation, incorporated on March 23, 1983 under the laws of St. Kitts–Nevis, with its registered office at the chambers of its incorporating counsel, Terence V. Byron, in St. Kitts–Nevis (Plaintiff's Exh. 4). Caribbean has a share capital of $1,000.00, Eastern Caribbean Currency, divided into 1000 shares of $1.00 each. *Id.* Its registered shareholders are Hyacinth Byron and Joan Liburd, both residents of St. Kitts–Nevis, each of whom holds one share only. *Id.* Caribbean alleges that they are the sole shareholders. *See* Affidavit of Michael A. Matthew, October 11, 1985, Exh. D. Defendant Marvin Douglas claims that he is the President of the corporation, and that the only other officers are Carmen L. Hernandez, Secretary, and Alberto de Paulo, Secretary for Limited Purposes. *Id.*

The charter party is ancillary to a complex, multi-party, international oil transaction. The principal parties to this transaction are Caribbean and the Nigerian National Petroleum Company ("NNPC"). In negotiating the contract with the NNPC, Caribbean was acting pursuant to the mandate of St. Kitts–Nevis. The mandate authorized Caribbean "to act on behalf of the Government of St. Kitts–Nevis for the purpose of arranging and concluding transactions involving the acquisition, transportation, storage, refining, distribution, financing, and marketing of crude oil and products related to or derived therefrom" (Plaintiff's Exh. 8).

Caribbean issued powers of attorney to de Paulo and Matthew, which empowered them to enter into a contract between Caribbean and the NNPC for the importation of crude oil, and to enter into any related ancillary contracts "for the transportation, financing, refining, distribution or any other matters related to such crude oil or

---

**1.** 9 U.S.C. § 8 (1982).

**2.** 9 U.S.C. §§ 4 & 5 (1982).

products derived therefrom" (Plaintiff's Exhs. 5 & 7). These powers of attorney were made irrevocable for the duration of any such contracts. *Id.* The St. Kitts–Nevis mandate expressly approved and authorized these powers of attorney (Plaintiff's Exh. 8).

On April 17, 1985, Caribbean and the NNPC concluded a contract for the sale of crude oil. Matthew signed on behalf of Caribbean, and de Paulo signed as a witness. Plaintiff's Exh. 11; Matthew Deposition at 13–14, 17, 19, 62–66; de Paulo Deposition at 77, 78. Thereafter, on June 14, 1985, de Paulo executed a contract on behalf of Caribbean for the resale of the oil to Afro American Petroleum ("Afro") (Plaintiff's Exh. 12). Afro then contracted with Coastal (Bermuda) Ltd. for the further resale of the oil (Plaintiff's Exh. 13).

Each of these contracts contained provisions relating to the charter of a vessel to carry the oil. The contract between Caribbean and the NNPC required Caribbean to provide the vessel. *See* Plaintiff's Exh. 11, Part II, ¶¶ 3–6. The Caribbean–Afro contract also provided that Caribbean was to make arrangements for the vessel charter, with risk and title passing to Afro when the vessel reached international waters (Plaintiff's Exh. 12, ¶ 29). The charter rate was subject to Afro's approval. *Id.* The agreement between Afro and Coastal provided that Afro would charter the vessel, subject to approval of the charter terms by Coastal, Caribbean and the NNPC. *See* Plaintiff's Exh. 13, Art. 6(b)(1) & (2). Afro then was to assign the charter party to Coastal on or before the date the vessel issued its notice of readiness. *Id.* at Art. 6(b)(4).

Captain Ayo Ajayi, the signatory for Afro on the contracts with Caribbean and Coastal, began negotiations for a charter in late June or early July of 1985. He contacted Atlantic Chartering, Inc. ("Atlantic") and informed them that he was seeking a vessel on behalf of Caribbean (Deposition of John Raby at 11, 12). Matthew, however, denies that he authorized Ajayi to contact ship brokers (Matthew Dep'n at 43–44).

Maritime, having learned of Caribbean's interest in chartering a vessel, informed Atlantic of the Senhorita's availability (Raby Dep'n at 16–17). On July 12, 1985, Maritime's broker, Seascope, sent an indication by telex to Atlantic proposing the terms and conditions upon which Caribbean could charter the Senhorita (Plaintiff's Exh. 15). Atlantic sent a telex to Caribbean at the offices of G.M. Energy Corporation, to the attention of Matthew, asking that Matthew review the indication on the Senhorita and authorize the fixture on behalf of Caribbean (Plaintiff's Exh. 16). Ajayi responded with a telex to Atlantic confirming that he was authorized to approve the terms and conditions for the Senhorita and promised that he would back-up his authority with a corporate telex from Caribbean (Plaintiff's Exh. 17).

That same day, Matthew, acting on behalf of Caribbean, accepted Maritime's offer of the Senhorita in the following telex, sent from the offices of G.M. Energy to Atlantic Chartering:

TO: ATLANTIC CHARTERING
ATTN: MR. JOHN RABY
FR: CARIBBEAN TRADING & FIDELITY
THIS WILL ACKNOWLEDGE OUR RECEIPT OF YOUR OFFER, TRANSMITTED TO US BY AFRO AMERICAN PETRO. AT 11:15 D.S.T. JULY 12, 1985 RE THE CHARTER PARTY FOR THE SENHORITA VESSEL.
WE HEREBY ACCEPT YOUR OFFER AND NOW MAKING ARRANGEMENTS AS REQUIRED.
REGARDS,
MICHAEL Z. MATTHEW
JULY 12, 1985

(Plaintiff's Exh. 19)

Later that day Matthew sent another telex from the offices of G.M. Energy confirming that Caribbean had taken steps to supply a down-payment of $80,000.00 to Maritime as called for in the charter (Plaintiff's Exh. 20). Atlantic responded with a telex to Caribbean at the offices of G.M. Energy informing Caribbean that at the insistence of Coastal, the charter party would provide for New York as the place

of arbitration, and would also include a clause relating to the anticipated assignment to Coastal (Plaintiff's Exh. 21).

Atlantic prepared a fixture recap, summarizing the terms to which Maritime and Caribbean had agreed in the prior telex messages, and sent it to Ajayi, with the request that he forward it to Caribbean (Plaintiff's Exh. 22). Thereafter, on approximately July 15, 1985, de Paulo directed his bank to transfer $80,000.00 from his account in New York to the account of Maritime as a down-payment on the Senhorita charter party (de Paulo Dep'n at 93). After receiving the down-payment, the Senhorita's master gave notice of the vessel's readiness to load cargo and requested berthing instructions (Plaintiff's Exh. 23). Matthew testified that he ignored this notice of readiness (Matthew Dep'n at 68). Nevertheless, on July 16, 1985, Caribbean sent a telex through its broker to Maritime's broker containing specific voyage instructions for the Senhorita. *See* Plaintiff's Exh. 26.

On July 17, 1985, Maritime informed Matthew that the cargo was not ready for loading, and would not be available for loading by July 18 (Plaintiff's Exh. 27). Under the charter party Maritime had an option to cancel, which it could exercise if loading of the cargo did not commence within three days after tender of the notice of readiness, and Caribbean had an option to cancel, which it could exercise prior to tender of the notice of readiness (Plaintiff's Exhs. 22 & 25, Part I, ¶ M(1), Part II, ¶ 5). Since the Senhorita tendered its notice of readiness on July 15, the failure to load by July 18 activated Maritime's option to cancel. Maritime offered to extend its option to cancel to July 22, and suggested that the $80,000.00 deposit be applied to resulting demurrage (Plaintiff's Exh. 27). Caribbean responded with a telex from de Paulo which accepted Maritime's proposed modification (Plaintiff's Exh. 28).

On July 18, 1985, Atlantic prepared a formal written charter party between Maritime and Caribbean and forwarded the original document to Seascope for Maritime's signature, with copies to Caribbean and Afro. *See* Plaintiff's Exh. 25. Matthew admitted receiving the working copy of the charter party, but he ignored it (Matthew Dep'n at 38).

On July 19, 1985, Maritime asked for a further $39,000.00 payment to cover demurrage (Plaintiff's Exh. 29). Caribbean responded on July 24, 1985 with a telex from de Paulo requesting that Maritime waive their request for the $39,000.00 payment (Plaintiff's Exh. 30). Caribbean also stated that it agreed to extend its right to cancel the charter to July 28. *Id.* Maritime responded on July 25, and reminded Caribbean that Caribbean's option to cancel the charter party had expired when the Senhorita tendered its notice of readiness (Plaintiff's Exh. 32).

The Senhorita remained at Caribbean's disposal at Bonny, Nigeria between July 15 and August 7, 1985. On August 7, 1985, in a telephone conversation with counsel for Maritime, Matthew stated that he considered the charter party cancelled as of July 19, 1985, and that he was shocked to hear that the vessel was still at Bonny, Nigeria (Plaintiff's Exh. 36). Counsel for Maritime sent Caribbean a telex summarizing this conversation, but Caribbean did not respond (Affidavit of Lawrence J. Bowles, December 2, 1985, ¶ 55).

## II. *Discussion*

■ There is no serious dispute as to the existence of a contract of charter party between Maritime and Caribbean. A telex fixture constitutes an agreement as to the essential terms of a charter party. *See Great Circle Lines, Ltd. v. Matheson & Co., Ltd.,* 681 F.2d 121, 125–26 (2d Cir. 1982). Here, plaintiff need not rely only on the fixture, which Matthew accepted on behalf of Caribbean, since subsequent events further confirmed the existence of the charter party. The brokers drafted a formal charter party and sent it to Maritime for signing. Even before receiving the formal charter party agreement, de Paulo and Matthew had taken steps to transfer $80,000.00 to Maritime as a deposit. After the vessel tendered its notice of readiness to Caribbean through brokerage channels, Caribbean gave the vessel voyage orders and amended and extended the

charter party. On these facts the existence of a binding charter party is clear.

The central issue in this case, then, is whether the charter party binds defendants other than Caribbean.[3] Plaintiff propounds several theories in an attempt to hold all the defendants subject to the charter party. With respect to defendants Douglas, de Paulo, and Matthew, plaintiff asserts that the Court should disregard the corporate form of Caribbean and hold the defendants individually liable both on the charter party and for fraud. As for defendant St. Kitts, plaintiff has alleged that St. Kitts is liable, on the charter and in fraud, as Caribbean's undisclosed principal. Finally, plaintiff contends that Caribbean was merely one member in a joint venture consisting of all the named defendants, plus those defendants that plaintiff seeks to join under its proposed amended complaint. Under this joint venture theory, each member of the venture would be liable as a party to the charter agreement. Based on these theories, plaintiff seeks an order compelling all defendants, both named and proposed, to submit to arbitration pursuant to the charter party.

With the exception of Caribbean, all defendants have moved to dismiss pursuant to Rule 12(b)(6), contending that the charter binds only Caribbean. Douglas and St. Kitts–Nevis have also moved to dismiss on jurisdictional grounds. The Court will consider the jurisdictional motions before turning to the 12(b)(6) motions, the motion to vacate the maritime attachment, and Douglas's motion to dismiss St. Kitts' counterclaim. Then, the Court will rule on plaintiff's cross-motions. Finally, the Court will consider the cross-motions for sanctions.

### A. *Douglas's Jurisdictional Motions*

■ Douglas claims that the Court lacks subject matter jurisdiction over the claims asserted against him. Douglas contends that he was not involved in the charter of the Senhorita, and was unaware of the actions taken by Matthew and de Paulo in this regard until long after the fact. He claims that his actions were unconnected with the maritime aspects of the transaction, and therefore, that admiralty jurisdiction is lacking.

Federal subject matter jurisdiction is determined by the face of the well-pleaded complaint, *Phillips Petroleum Co. v. Texaco Inc.*, 415 U.S. 125, 127–28, 94 S.Ct. 1002, 1003–04, 39 L.Ed.2d 209 (1974); *Gibson v. Firestone*, 741 F.2d 1268, 1270 (11th Cir. 1984), *cert. denied*, 469 U.S. 1229, 105 S.Ct. 1230, 84 L.Ed.2d 367 (1985), and all well-pleaded allegations must be taken as true for purposes of determining the existence of federal jurisdiction. *Gibson*, 741 F.2d at 1270 (citing *Goosby v. Osser*, 409 U.S. 512, 521 n. 7, 93 S.Ct. 854, 860 n. 7, 35 L.Ed.2d 36 (1973)); *see Molyneux v. Arthur Guinness and Sons, P.L.C.*, 616 F.Supp. 240, 243 (S.D.N.Y. 1985) ("To maintain an action in federal court, the plaintiff must allege facts which, if taken as true, are sufficient to support federal jurisdiction over the claims."). A dismissal for lack of subject matter jurisdiction requires that the complaint be patently without merit. *Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 70, 98 S.Ct. 2620, 2628, 57 L.Ed.2d 595 (1978); *Falls Riverway Realty v. City of Niagara Falls*, 754 F.2d 49, 54 n. 3 (2d Cir.1985); *Morabito v. Blum*, 528 F.Supp. 252, 260 (S.D.N.Y.1981).

In the present case, plaintiff has alleged that Douglas is liable on the Senhorita contract due to his domination of Caribbean. Since a contract for the hire of a vessel is within the Court's admiralty jurisdiction, *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961); *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 984

---

**3.** In affidavits submitted to the Court, Douglas and St. Kitts–Nevis have questioned the authority of de Paulo and Matthew to enter into a binding charter party on behalf of Caribbean. *See* Declaration of Marvin Douglas, January 15, 1987, ¶¶ 2–7; Affidavit of Terence Victor Byron, June 17, 1987, ¶ 9; Affidavit of Richard V. Singleton, July 13, 1987, ¶¶ 14–17. Caribbean, however, has not moved to dismiss on this ground. Accordingly, the Court need not decide whether the charter party is binding on Caribbean. Moreover, Caribbean's obligations under the charter party are largely irrelevant to this case since Caribbean appears to have no assets. Plaintiff's vigorous efforts to establish the liability of the other defendants, clearly demonstrates that plaintiff has little hope of recovering damages from Caribbean.

n. 1 (2d Cir.1980), plaintiff's allegations provide a basis for the exercise of subject matter jurisdiction over the claims against Douglas. Douglas has not shown that these allegations are completely meritless, and, as the authorities cited above make clear, these allegations must be taken as true. Therefore, the motion to dismiss for lack of subject matter jurisdiction is denied.

Douglas also asserts that the Court lacks personal jurisdiction over him. He was served with the summons and complaint in San Juan, Puerto Rico, and he claims to have had virtually no contact with New York since moving to Puerto Rico fifteen years ago. He admits that he visited New York three or four times in connection with finding an F.O.B. purchaser for the Nigerian crude oil, but claims that his trips to New York were unrelated to the charter of the Senhorita. Douglas contends that he does no business, has no assets, and does not reside in New York. Accordingly, he asserts that the Court lacks personal jurisdiction under both the state long arm statute, N.Y.C.P.L.R. § 302(a)(1), and the minimum contacts standard. *See, e.g., Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

Plaintiff, however, asserts that even if Douglas himself has no contacts with New York, Douglas is bound by the provisions of the charter party providing for arbitration in New York. Plaintiff contends that Caribbean's consent to arbitrate in New York is binding on Douglas, and constitutes consent to personal jurisdiction in New York.

The Supreme Court has held that a federal court sitting in admiralty should give full effect to forum-selection clauses. *M/V Bremen v. Zapata Offshore Co.,* 407 U.S. 1, 9–10, 92 S.Ct. 1907, 1912–1913, 32 L.Ed.2d 513 (1972). In *Bremen,* the Court recognized that a forum-selection clause is tantamount to consent to jurisdiction in a particular forum. *See* 407 U.S. at 10–11, 92 S.Ct. at 1913–1914 (1972) (citing *National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315–16, 84 S.Ct. 411, 414–15, 11 L.Ed.2d 354 (1964)). An arbitration agreement is a specialized kind of forum-selection clause, and is subject to the same

principles. *See Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974). Accordingly, an agreement to arbitrate in a particular forum constitutes consent to personal jurisdiction in the courts of that forum. *Merrill Lynch, Pierce, Fenner & Smith v. Lecopulos,* 553 F.2d 842, 844 (2d Cir.1977).

Plaintiff bears the burden of proving that Douglas has consented to personal jurisdiction in New York. *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985). In the absence of an evidentiary hearing, plaintiff need only make a *prima facie* showing of personal jurisdiction through affidavits and other supporting materials, notwithstanding any controverting presentation by the defendant. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981); *Catsimatidis v. Innovative Travel Group, Inc.,* 650 F.Supp. 748, 750 (S.D.N.Y.1986); *Bialek v. Racal-Milgo, Inc.,* 545 F.Supp. 25, 32–33 (S.D.N.Y.1982). The supporting materials are construed in the light most favorable to the plaintiff, and all doubts are to be resolved in plaintiff's favor. *Hoffritz for Cutlery,* 763 F.2d at 57 (2d Cir.1985).

Plaintiff's contention that Douglas has consented to personal jurisdiction in New York is premised on the theory that Douglas is personally liable for the corporate acts of Caribbean. Incorporation generally shields shareholders, officers, managers and agents from liability arising out of corporate activities. *Armada Supply, Inc. v. S/T Agios Nikolas,* 613 F.Supp. 1459, 1471 (S.D.N.Y.1985). When, however, individuals use the corporation to perpetrate a fraud, or so dominate and disregard the corporate form that the corporation primarily transacts their personal business, the Court may pierce the corporate veil and impose liability directly upon the individuals. *Kirno Hill Corp. v. Holt,* 618 F.2d 982, 985 (2d Cir.1980); *Armada Supply, Inc.,* 613 F.Supp. at 1471–72.

Plaintiff has submitted enough evidence to make a *prima facie* case for piercing the corporate veil and holding Douglas bound by Caribbean's consent to New York jurisdiction. According to the deposition

testimony of Daniel Montgomery, a participant in the early stages of the negotiations for a crude oil contract with Nigeria, Douglas treated the mandate to negotiate a crude oil contract for St. Kitts as a personal business opportunity. Prior to issuing the mandate to Caribbean, St. Kitts entered into a contract with Metropolitan Oil & Chemical of P.R. Inc. ("Metoil"), pursuant to which Metoil was to obtain a crude oil contract on St. Kitts' behalf (Montgomery Dep'n at 124; Plaintiff's Exh. 50). The contract provided Metoil with substantially the same authority as that granted in the Caribbean mandate (Plaintiff's Exh. 50). Douglas, who held himself out as vice-president and treasurer of Metoil (Plaintiff's Exh. 51), signed the contract on Metoil's behalf on August 30, 1982. The initial negotiations with Nigeria were conducted under the authority granted in this contract (Montgomery Dep'n at 133–36).

On April 11, 1984, Douglas informed Montgomery that Caribbean would be assuming Metoil's role in the oil deal (Montgomery Dep'n at 158–165; Plaintiff's Exh. 66A). Douglas said that he was employing Caribbean for two reasons: first, to exclude his partners in Metoil from profits on the oil deal, and, second, because the presence of a St. Kitts–Nevis entity in the deal would facilitate participation by the St. Kitts–Nevis government (Montgomery Dep'n at 160–62, 166). Douglas has not submitted any evidence that Caribbean compensated Metoil for the transfer of the right to negotiate on St. Kitts' behalf. Construed in a light most favorable to the plaintiff, it appears that Douglas treated the opportunity to act on behalf of St. Kitts' as his personal property.

In addition, it also appears that Douglas acted with disregard for corporate formalities. In March of 1983, Terence Byron, an attorney admitted to practice before the High Court of Justice of the Eastern Caribbean Supreme Court in the St. Kitts Circuit, incorporated Caribbean on Douglas's behalf[4] (Byron Affidavit at ¶¶ 1 & 2). According to Byron, Caribbean's articles of

association provide that Joan Liburd and Hyacinth Byron are the sole shareholders, each holding one share with a par value of one dollar, East Caribbean Currency (*Id.* at ¶ 3). The shareholders never appointed any directors or officers (*Id.* at ¶ 6). Nonetheless, Douglas held himself out as Caribbean's President. *See, e.g.,* Plaintiff's Exh. 5. Disregard for corporate formalities is an established basis for piercing the corporate veil. *See, e.g., Walter E. Heller & Co. v. Video Innovations, Inc.,* 730 F.2d 50, 53 (2d Cir.1984); *American Bell Inc. v. Federation of Telephone Workers of Pa.,* 736 F.2d 879, 886 (3d Cir.1984).

Finally, Caribbean's lack of capital is an additional reason to pierce the corporate veil. *See Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944); *National Marine Service, Inc. v. C.J. Thibodeaux & Company,* 501 F.2d 940, 942 (5th Cir.1974); *Ariate Compania Vaniera, S.A. v. Commonwealth Tankship Owners Ltd.,* 310 F.Supp. 416, 420 (S.D.N.Y.1970). Caribbean has a share capital of only $1,000. According to de Paulo, Caribbean had no assets except for the down-payment which de Paulo tendered to the Nigerian government on Caribbean's behalf (de Paulo Dep'n at 47). Even that money, de Paulo claims, was merely a loan to Caribbean, and as such is not a true asset (Affidavit of Alberto de Paulo, October 22, 1985, ¶¶ 3–5). Caribbean's capitalization is obviously inadequate for a corporation involved in a multi-million dollar oil contract.

In light of the foregoing evidence, plaintiff has carried the burden of making a *prima facie* case for piercing the corporate veil and holding Douglas bound by Caribbean's consent to jurisdiction. Accordingly, Douglas's motion to dismiss for lack of personal jurisdiction is denied.

**B.** *St. Kitts' Jurisdictional Motions*

█ St. Kitts contends that it is immune from suit under the Foreign Sover-

---

**4.** Douglas argues that Byron's affidavit is inadmissible because it violates the attorney-client privilege. The affidavit, however, only discusses the corporate records which are on file with the government of St. Kitts and which are part of a public record. Consequently, the affidavit does not violate the privilege because it does not disclose any confidential communications.

eign Immunities Act, 28 U.S.C. §§ 1330, 1602–1611, which provides that foreign governments, their agencies and their officers are immune from suit unless their conduct falls within specific enumerated exceptions. A federal court lacks subject matter jurisdiction over claims not covered by the exceptions. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983).

■ The Act provides the exclusive jurisdictional basis for suits against foreign states, *McKeel v. Islamic Republic of Iran*, 722 F.2d 582, 586 (9th Cir.1983), *cert. denied*, 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984); *Williams v. Shipping Corporation of India*, 653 F.2d 875, 880 (4th Cir.1981), *cert. denied*, 455 U.S. 982, 102 S.Ct. 1490, 71 L.Ed.2d 691 (1982), and it incorporates due process notions of minimum contacts. *See Carey v. National Oil Corp.*, 453 F.Supp. 1097, 1101 (S.D.N.Y. 1978), *aff'd*, 592 F.2d 673 (2d Cir.1979); H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 13, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6612. Therefore, any exercise of jurisdiction over a foreign sovereign must fall within a specific statutory exception, and must satisfy the constitutional requirements of due process.

Section 1605 of the Act provides that a foreign state may waive its immunity either explicitly or by implication. Plaintiff contends that St. Kitts, as the undisclosed principal of Caribbean on the charter party, has implicitly waived its immunity by consenting to arbitration in New York. According to plaintiff, the mandate from St. Kitts to Caribbean, which authorized Caribbean to enter into contracts for the transportation of crude oil on St. Kitts' behalf, and which expressly authorized the powers

of attorney granted to Matthew and de Paulo, proves that St. Kitts was an undisclosed principal for Caribbean on the contract of charter. Plaintiff contends that the contract's arbitration provision is therefore binding on St. Kitts and acts as a waiver of sovereign immunity.

■ St. Kitts vigorously disputes plaintiff's agency theory and argues that Matthew and de Paulo were not acting as agents of St. Kitts. At this juncture, however, the Court need not address this argument, for in the first instance, the sovereign immunity defense is an issue of subject matter jurisdiction.[5] As discussed above, the subject-matter inquiry is governed by the well-pleaded complaint rule, which provides that all well-pleaded allegations must be taken as true for purposes of determining the existence of federal jurisdiction. Therefore, defendant's disputation of plaintiff's agency theory is irrelevant to the subject-matter jurisdiction inquiry.

■ As alleged in the complaint and confirmed by the documentary exhibits, the St. Kitts mandate granted Caribbean, de Paulo and Matthew the authority to act as St. Kitts' agent for the purposes of negotiating a contract for the transportation of crude oil. Assuming these allegations are true, Matthew and de Paulo were the agents of St. Kitts, and, in contracting with plaintiff, were acting within the scope of their authority under both the powers of attorney and the mandate. Actions taken by an agent within the scope of his agency are binding on an undisclosed principal. *See Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir.1980). For purposes of the jurisdictional motion, therefore, St. Kitts is

---

**5.** The provisions of the Act governing subject matter and personal jurisdiction are codified at 28 U.S.C. § 1330. Section 1330(a) governs subject-matter jurisdiction and section 1330(b) governs personal jurisdiction. Section 1330(a) provides for subject-matter jurisdiction whenever a foreign state is not entitled to immunity under the substantive provisions of the Act (§§ 1605–1607), or under any applicable international agreement. Section 1330(b) provides for personal jurisdiction whenever subject-matter jurisdiction exists under subsection (a), and service of process has been made under section 1608. Thus, if none of the exceptions to immunity

applies, the Court lacks both subject-matter and personal jurisdiction. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n. 5, 103 S.Ct. 1962, 1967 n. 5, 76 L.Ed.2d 81 (1983). However, both the statutory scheme and the legislative history, indicate that subject-matter jurisdiction is the initial inquiry. *See* H.R.Rep. No. 1487, 94th Cong., 2d Sess. 13, *reprinted in* U.S. Code Cong. & Admin. News 6604, 6612 ("For personal jurisdiction to exist under section 1330(b), the claim must *first of all* be one over which the district courts have original jurisdiction under section 1330(a)") (emphasis added).

bound by the arbitration clause as an undisclosed principal. Consequently, the Court must consider whether the arbitration clause acts as a waiver of sovereign immunity under the Act.

The Act does not elaborate on how a foreign sovereign may implicitly waive its immunity. The legislative history, however, is illuminating. As examples of an implicit waiver under the Act, the House Judiciary Committee Report pointed to "cases where a foreign state has agreed to arbitration in another country or where a foreign state has agreed that the law of a particular country should govern a contract." H.R.Rep. No. 94–1487, 94th Cong., 2d Sess. 18, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6617.

A literal interpretation of the House Report would subject a foreign government to jurisdiction in the United States whenever it agreed to be governed by the laws or to arbitrate in the forum of any country other than its own, even when the contract makes no mention of the United States. This would result in a vast increase in the jurisdiction of the federal courts over matters involving sensitive foreign relations. *Verlinden B.V. v. Central Bank of Nigeria,* 488 F.Supp. 1284, 1302 (S.D.N.Y.1980), *aff'd,* 647 F.2d 320 (2d Cir.1981), *rev'd on other grounds,* 461 U.S. 480, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983). Some courts have avoided this result by interpreting the language narrowly, and have refused to find a waiver when the contract names a country other than the United States as the forum for arbitration or as the country whose law will govern. *See, e.g., Ohntrup v. Firearms Center Inc.,* 516 F.Supp. 1281, 1284–85 (E.D.Pa.1981), *aff'd,* 760 F.2d 259 (3d Cir.1985); *Verlinden,* 488 F.Supp. at 1301–02.

When the contract names the United States, however, it is both reasonable and consistent with the legislative history to find an implicit waiver. *See Ohntrup,* 516 F.Supp. at 1285 (*dictum*); *Verlinden,* 488 F.Supp. at 1301 (*dictum*). Under this interpretation, the federal courts avoid the aggrandizement in subject-matter jurisdiction that would otherwise result. The arbitration agreement in this case, which names New York as the forum for arbitration, fits within the narrowest reading of the Act, and therefore, acts as a waiver of immunity for purposes of subject-matter jurisdiction.[6]

Personal jurisdiction under the Act is governed by section 1330(b). Section 1330(b) provides that personal jurisdiction over a foreign state exists whenever there is subject matter jurisdiction, provided that service of process is proper under section 1608 of the Act. Although St. Kitts has asserted improper service as an affirmative defense in its answer, it has not challenged service on this motion. Therefore, for the same reason that the Court has subject-

---

**6.** St. Kitts has cross-claimed against Caribbean, Matthew, de Paulo and Douglas, and has also commenced a separate action against Matthew, de Paulo, Douglas and others. *The Federation of St. Christopher & Nevis v. Matthew, et al.,* 87 Civ. 4988 (WCC). Plantiff contends that these actions constitute an alternate basis for finding a waiver of immunity under the Act. There is no merit to this theory.

The Second Circuit has stated that a foreign sovereign may assure its immunity under the Act through the early assertion of the immunity defense. *Canadian Overseas Ores Ltd. v. Compania de Acero,* 727 F.2d 274, 278 (2d Cir.1984). St. Kitts asserted its sovereign immunity defense in its answer. The answer was St. Kitts' first responsive pleading in this case, as well as its first appearance. Accordingly, St. Kitts secured its immunity by asserting it early, prior to taking any other action which could be construed as a waiver of its sovereign immunity.

Plaintiff, however, relies on *In re Oil Spill By "Amoco Cadiz" off Coast of France,* 491 F.Supp. 161, (N.D.Ill.1979), where the court found a waiver of immunity even though the foreign state and its political subdivisions asserted the immunity defense in their pleadings. In *Amoco Cadiz,* the court was considering the immunity question in the context of several suits which had been consolidated as multi-district proceedings. In one of the proceedings the Republic of France sued Amoco, and in another several French political subdivisions asserted claims against Amoco.

The instant case is clearly distinguishable. Whereas France and its political subdivisions had asserted claims against Amoco, here, St. Kitts' has asserted claims against everyone but the plaintiff. The issue of whether St. Kitts has waived its immunity as to the other defendants is not before the Court, but it is clear that St. Kitts' claims against those defendants cannot act as a waiver of its immunity as to plaintiff.

matter jurisdiction, the Court also has personal jurisdiction.[7]

## C. *Defendants' Motions to Dismiss on the Merits*

In opposing the 12(b)(6) motions, plaintiff has submitted numerous depositions and 175 documentary exhibits, and defendants have responded with affidavits. Because the submissions on these motions go beyond the pleadings, the Court shall treat the defendants' motions as motions for summary judgment. *See* Rule 12(b), Fed. R.Civ.P. Under Rule 56(c), Fed.R.Civ.P., the moving parties, here the defendants, must show that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law.

### 1. Piercing the Corporate Veil

Douglas, Matthew and de Paulo rely on Caribbean's status as a limited liability corporation to argue that they have no individual liability for Caribbean's alleged breach of the charter party. As discussed above, incorporation generally shields individuals from liability for corporate acts, except when the individuals use the corporation to perpetrate a fraud, or so dominate and disregard the corporate form that the corporation primarily transacts their personal business.

As to defendant Douglas, the Court's resolution of the jurisdictional motion demonstrates that plaintiff has made a *prima facie* case for piercing the corporate veil and imposing liability on Douglas personally. Thus, with respect to the piercing claim, plaintiff has submitted sufficient evidence to show that there are significant issues of material fact precluding summary judgment in favor of Douglas.

■■■ Matthew and de Paulo have also failed to show that they are entitled to summary judgment on the piercing claim. The documentary exhibits and the affida-

vits submitted on this motion demonstrate that there are significant issues of fact concerning the question of whether Matthew and de Paulo have disregarded Caribbean's corporate form and used Caribbean as a vehicle for the transaction of their personal business.

First, there are indications that Matthew and de Paulo misappropriated Caribbean's rights under the Nigerian oil contract for their personal gain. Matthew and de Paulo eventually took delivery of 698,289 barrels of crude oil from Nigeria on November 20, 1985 (Exh. 152; Montgomery Dep'n at 506–10). According to Douglas and St. Kitts, however, Caribbean and St. Kitts never received any oil or proceeds from the sale of the oil (Douglas's Third Declaration, ¶¶ 3–4; Affidavit of Tapley Seaton, ¶¶ 3–9; Affidavit of Michael O. Powell, ¶¶ 27–29). In addition, sometime after taking the initial delivery of crude oil, de Paulo and Matthew approached St. Kitts and obtained a new mandate authorizing a company which they were forming, Caribbean Trading & Fidelity Corp., to act on behalf of St. Kitts in place of Caribbean with respect to the Nigerian oil contract. Matthew and de Paulo received several additional shipments of crude oil pursuant to that mandate (Seaton Aff., ¶¶ 5–7). St. Kitts likewise did not receive any revenue or oil from these later deliveries (Seaton Aff., ¶ 8; Powell Aff., ¶¶ 29–30). The evidence that Matthew and de Paulo misappropriated the Nigerian oil contract for the benefit of a new company with a nearly indistinguishable name which they apparently controlled, as well as their failure to distribute proceeds from the oil they received pursuant to the Caribbean mandate, suggests that they used Caribbean to conduct their personal business.

■■■ Second, bank records indicate that de Paulo may have commingled his personal funds with corporate funds. Comming-

---

7. There may be some instances in which a waiver of personal jurisdiction under the Act would violate due process. *See Verlinden,* 488 F.Supp. at 1302 & n. 88. In the case at bar, however, it is clear that the waiver satisfies due process. As discussed above in regard to Douglas's motion to dismiss for lack of personal jurisdiction, consent to arbitration in a particular forum consti-

tutes consent to the jurisdiction of that forum, and it is well established that consent to jurisdiction does not offend due process. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 14, 105 S.Ct. 2174, 2182 n. 14, 85 L.Ed.2d 528 (1985); *National Union Fire Ins. v. Douglas,* No. 87 Civ. 2830, slip op. at 4 (S.D.N.Y. Apr. 4, 1988) [available on WESTLAW, 1988 WL 34808].

ling corporate and personal funds is a well recognized basis for piercing the corporate veil. *See, e.g., Labadie Coal Co. v. Black,* 672 F.2d 92, 98 (D.C.Cir.1982); *Dudley v. Smith,* 504 F.2d 979, 982 (5th Cir.1974). In his affidavit de Paulo admits that he deposited in his personal account $1,300,000, which third parties had advanced to Caribbean (de Paulo Aff., Oct. 22, 1985, ¶¶ 2–5). It appears from the following transactions, however, that the total sum he paid from this account on behalf of Caribbean is $1,430,000: (1) $1,140,000 paid to the Nigerian National Petroleum Corporation (Plaintiff's Exh. 49); (2) $80,000 dollars paid to Maritime (*Id.*); (3) $160,000 paid to Bank of Credit & Commerce International, Miami to fund a letter of credit (*Id.*; Parvez Dep'n at 20–21); (4) $50,000 paid to Matthew. The deposit of Caribbean funds in an account in de Paulo's name, combined with the discrepancy between the amount deposited and the amount paid on Caribbean's behalf, indicates that de Paulo may have commingled his money with Caribbean's. Even assuming that de Paulo had no personal funds in the account and that the discrepancy in amounts deposited and withdrawn from the account was the result of accrued interest as de Paulo asserts, the deposit of corporate money in a personal account indicates the same disregard for the corporate form as does commingling of funds.

Third, de Paulo apparently ignored corporate formalities by holding himself out as secretary of the corporation for limited purposes (de Paulo Aff., Oct. 22, 1985, ¶ 1). As discussed above, the attorney who incorporated Caribbean and whose offices serve as Caribbean's registered office (*see* Byron Aff., ¶ 2 & Exh. A), claims that Caribbean's shareholders never appointed any corporate officers.

Thus, plaintiff has adduced significant evidence tending to establish the following facts: (1) de Paulo and Matthew treated Caribbean's crude oil contract with Nigeria as a personal business opportunity; (2) de Paulo commingled his personal funds with Caribbean's corporate funds; (3) de Paulo ignored corporate formalities in holding himself out as an officer of the corporation. These facts are material to the question of whether Matthew and de Paulo dominated Caribbean and disregarded its corporate form, thereby rendering it appropriate to pierce the corporate veil and hold them personally liable for Caribbean's obligations on the charter party. In light of this evidence, defendant has not shown that it is entitled to summary judgment on the piercing claim.

**2. St. Kitts as Undisclosed Principal**

Plaintiff claims that St. Kitts is bound by the arbitration agreement as the undisclosed principal of Caribbean, de Paulo and Matthew. St. Kitts contends that it cannot be liable under an agency theory as an undisclosed principal because it exercised no control over de Paulo and Matthew.

An essential element of an agency relationship is that the principal has the power to control the agent. *In re Shulman Transport Enters., Inc.,* 744 F.2d 293, 295 (2d Cir.1984); *Boss v. International Brotherhood of Boilermakers,* 567 F.Supp. 845, 847 n. 1 (N.D.N.Y.) (Miner, J.), *aff'd,* 742 F.2d 1446 (2d Cir.1983), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984); *Meese v. Miller,* 79 A.D.2d 237, 436 N.Y.S.2d 496, 499 (4th Dep't 1981). When the existence of an agency relationship is uncertain, the courts often look to control as a critical indicator. *See id.*

A principal who has the right of control may nevertheless neglect to exercise it. Consequently, when the existence of an agency relationship is otherwise clear, the principal's failure to exercise control is not determinative. *See Restatement (Second) of Agency* § 14 comment b (1958).

There is no genuine dispute that St. Kitts did not exercise control over Matthew and de Paulo. Nevertheless, the St. Kitts mandate, which expressly incorporated the powers of attorney that Caribbean granted to Matthew and de Paulo, is a strong indicator of an agency relationship. A written power of attorney is a formal contract of agency and creates a principal-agent relationship. *Smith v. United States,* 113 F.Supp. 702, 707 (D.Hawaii

1953); *Bank of Montreal v. Gallo,* 3 Conn. App. 268, 487 A.2d 1101, 1104, *certification denied,* 195 Conn. 803, 491 A.2d 1103 (1985); *Scherer v. Scherer,* 405 N.E.2d 40, 47 (Ind.App.1980). Because the mandate constitutes significant evidence of an agency relationship, the failure to exercise control, standing alone, does not disprove that St. Kitts was an undisclosed principal. Therefore, St. Kitts is not entitled to judgment as a matter of law.

St. Kitts argues that even if an agency relationship existed, de Paulo and Matthew exceeded their authority by entering into the Senhorita charter party. As discussed above, an undisclosed principal is not bound by actions of its agents in excess of their authority. Therefore, St. Kitts concludes that they are not bound by the Senhorita charter party.

In support of this contention St. Kitts has submitted the affidavit of Michael O. Powell, Deputy Prime Minister of St. Kitts. Mr. Powell asserts that it was his understanding that Caribbean would resell the oil free on board, and therefore that there would be no need to charter a vessel (Powell Aff., ¶ 25). Douglass stated that this was his understanding of the transaction as well (Third Douglas Declaration, ¶ 2).

On the evidence submitted on this motion, however, St. Kitts cannot demonstrate the absence of a genuine dispute as to the scope of its agents' authority. The mandate, by reference to the powers of attorney, unambiguously authorized Matthew and de Paulo to enter into contracts on behalf of St. Kitts for the transportation of crude oil purchased from Nigeria. It did not limit this authority to contracts for a free-on-board sale. St. Kitts, therefore is not entitled to summary judgment because the mandate demonstrates that there is a genuine dispute as to a material issue of fact—whether Matthew and de Paulo exceeded their authority.

■ The mandate not only demonstrates a genuine dispute as to a material issue, it precludes defendants from introducing any evidence of an unwritten limitation on the scope of the agency. When, as here, there is no ambiguity as to the terms of a power of attorney, parole evidence is not admissible to establish the extent of authority conferred by the power of attorney. 3 Am.Jur.2d *Agency* § 35 (1986). Thus, the testimony contained in the Powell affidavit and Douglas declaration is inadmissible.

3. Plaintiff's Cause of Action for Fraud

Defendants argue that the fraud claim merely restates the contract cause of action and therefore should be dismissed as a matter of law. Defendants have also argued that plaintiff has not stated the fraud claim with sufficient particularity.

■ Although failure to perform under a contract generally does not give rise to a claim for fraud, *see, e.g., Hotel Constructors, Inc. v. Seagrave Corp.,* 574 F.Supp. 384, 387 (S.D.N.Y.1983); *Wegman v. Dairylea Co-op, Inc.,* 50 A.D.2d 108, 113, 376 N.Y.S.2d 728, 735 (4th Dep't 1975), *appeal dismissed,* 38 N.Y.2d 918, 382 N.Y.S.2d 979, 346 N.E.2d 817 (1976), New York courts have long recognized that an action for fraud will lie if the promisor did not intend to perform at the time he entered into the contract. *See, e.g., Hotel Constructors,* 574 F.Supp. at 387–88; *Sabo v. Delman,* 3 N.Y.2d 155, 164 N.Y.S.2d 714, 143 N.E.2d 906 (1957). Thus, the material issue on this claim is whether Caribbean intended to perform its obligations under the charter party at the time it undertook them.

■ Plaintiff has submitted evidence on this motion which raises questions of fact as to this issue. As discussed above, Caribbean had virtually no capital. The crude oil contract with Nigeria, however, called for payments of several million dollars. Caribbean hoped to finance the transaction through back-to-back letters of credit. Caribbean contracted to purchase the oil from Nigeria and, pursuant to a second contract, agreed to resell it to Afro (Plaintiff's Exhs. 11 & 12). Afro had further contracted to resell the oil to Coastal (Plaintiff's Exh. 13). While the stream of oil flowed from Nigeria to Coastal, the credit was to flow in the opposite direction: Coastal agreed to open a letter of credit in favor of Afro; Afro agreed to open a letter

of credit in favor of Caribbean; and Caribbean agreed to open a letter of credit in favor of Nigeria (de Paulo Dep'n, 98–99).

During July, 1985, de Paulo became aware of certain facts that should have alerted him to the impending failure of the resale to Coastal, and as early as May, 1985, Matthew had already concluded that the deal was unworkable (Matthew Dep'n, 71–72). Coastal was insisting on certain conditions in its letters of credit that were unacceptable to Nigeria and were impeding the oil contract (de Paulo Dep'n, 97–101). Coastal also was insisting that a vessel be in place before it would agree to purchase the oil from Afro. De Paulo believed that without the proper letters of credit it would be foolish to secure a vessel, and he conveyed this assessment to Matthew (de Paulo Dep'n, 93–94). Matthew, however, decided that Caribbean should secure a vessel to placate Coastal and to convince Coastal that Caribbean had a contract with Nigeria (*Id.* at 94–95).

This evidence indicates that when Matthew accepted Maritime's fixture on July 12, 1985, de Paulo and Matthew may have already been aware of their inability to provide the cargo on the agreed date. If proven at trial, this would demonstrate that they did not intend to perform at the time they negotiated the charter party, and they would be liable for fraud. *See Triangle Underwriters, Inc. v. Honeywell, Inc.,* 604 F.2d 737, 747 (2d Cir.1979); *Hotel Constructors,* 574 F.Supp. at 388; *Channel Master Corp. v. Aluminum Limited Sales,* 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958). Thus, plaintiff has raised issues of fact which are material to the fraud cause of action, thereby precluding summary judgment.

■ As discussed above, Matthew and de Paulo are agents of both Caribbean and St. Kitts for purposes of the summary judgment motion. When, as here, the agents are acting within the scope of their authority, the principal is liable for any acts of fraud the agents commit. *American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 566, 102 S.Ct. 1935, 1942, 72 L.Ed.2d 330 (1982); *Standard Surety & Casualty Co. v. Plantsville Nat'l Bank,* 158 F.2d 422 (2d

Cir.1946), *cert. denied,* 331 U.S. 812, 67 S.Ct. 1203, 91 L.Ed. 1831 (1947); *General Overseas Films, Ltd. v. Robin Int'l, Inc.,* 542 F.Supp. 684, 687 (S.D.N.Y.1982), *aff'd,* 718 F.2d 1085 (2d Cir.1983). Therefore, the fraud claim withstands St. Kitts' motion for summary judgment as well.

■ Although plaintiff has shown that it has a claim for fraud capable of withstanding a motion for summary judgment, plaintiff has not properly pled its claim. The cornerstone of plaintiff's fraud claim is the allegation that Caribbean, through its agents Matthew and de Paulo, entered into the contract of charter party without intending to perform. The complaint, however, does not contain this allegation. Therefore, the fraud claim is dismissed.

Plaintiff has submitted a proposed amended complaint, but this proposed complaint also fails to make a proper allegation of fraud based on contract. Nevertheless, the papers submitted on this motion demonstrate that plaintiff has a colorable claim for fraud. Therefore, in keeping with the standard imposed by Rule 15(a), Fed.R. Civ.P., which requires that leave to amend a pleading "shall be freely given when justice so requires," plaintiff is permitted to amend its complaint to allege that Matthew and de Paulo, acting as agents for Caribbean and St. Kitts, did not intend to perform the charter party at the time they agreed to it. Plaintiff should further amend its complaint to include more specific allegations of fraud as set forth in its proposed amended complaint. With these amendments the complaint should put defendant on notice as to the time, place and content of the alleged misrepresentations as required under Rule 9(b). *See River Plate Reinsurance Co., Ltd. v. Jay–Mar Group, Ltd.,* 588 F.Supp. 23 (S.D.N.Y.1984).

### D. *The Motion to Vacate the Attachments*

De Paulo and Matthew have asserted three grounds in support of their motion to vacate the attachments on their property. First, they contend that maritime attachment is not available when a plaintiff claims that defendants are subject to the

Court's personal jurisdiction. *See East Asiatic Co., Ltd. v. Indomar, Ltd.*, 422 F.Supp. 1335, 1340 (S.D.N.Y.1976).

Plaintiffs, however, have not claimed that the Court has personal jurisdiction over Matthew and de Paulo. The only asserted basis for jurisdiction over these two defendants is maritime attachment. Consequently, defendants' first argument misses the point.

Second, Matthew and de Paulo assert that the claims against them do not fall within the Court's admiralty jurisdiction, and therefore that there is no basis for a maritime attachment. As discussed above, however, the main claim against de Paulo and Matthew is for demurrage due under a contract of charter party, and it is well established that this is an admiralty claim.

■ Defendants' reliance on *Miravalles Compania Naviera, S.S. v. Nissho Co., Ltd.*, 207 F.Supp. 716 (E.D.N.Y.1962) is misplaced. In *Miravalles,* the Court found admiralty jurisdiction lacking as to a broker who signed a charter party as agent for a disclosed principal. 207 F.Supp. at 717. Here, by contrast, liability is sought against Matthew and de Paulo as alter egos of Caribbean. In contrast to an agent for a disclosed principal, who has no primary liability on the principal's contract, *see* 3 Am.Jur.2d *Agency* § 302 (1986), a person who has so dominated a corporation as to become a corporate alter ego can be held liable on the corporation's contracts. *Miravalles,* therefore, is inapposite.

Third, defendants argue that the attachment should be vacated because plaintiff has failed to make a *prima facie* case. The summary judgment motion, however, reveals that plaintiff has made a *prima facie* case. Accordingly, the motion to vacate the attachment is denied.

### E. *Douglas's Motion to Dismiss St. Kitts' Cross–Claim*

St. Kitts has asserted two cross-claims against Douglas, Matthew, de Paulo and Caribbean. Both claims seek indemnity for any liability that St. Kitts incurs as a result of actions taken in connection with the mandate. Only Douglas has moved to dismiss these claims. Douglas argues that the cross-claims do not arise out of the same transaction or occurrence as the main claim, and therefore they do not meet the requirements of Rule 13(g), Fed.R.Civ.P., nor do they fall within the Court's ancillary jurisdiction.

■ Cross-claims properly asserted under Rule 13(g) are within the Court's ancillary jurisdiction. *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 376, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978); *Federman v. Empire Fire and Marine Ins. Co.*, 597 F.2d 798, 810–11 (2d Cir.1979). Therefore, this motion presents only one issue: whether the cross-claim is valid under 13(g).

■ St. Kitts' cross-claim for indemnity falls within the express language of Rule 13(g), which authorizes claims against co-parties arising out of the same "transaction or occurrence" as the main claim, and cites a claim for indemnity as an example. *See also Federman,* 597 F.2d at 811. The courts have employed several tests to determine whether a claim arises out of the same transaction or occurrence as the main claim. The Second Circuit has identified three factors common to these tests, no one of which is conclusive: (1) identity of facts between original claim and cross-claim; (2) mutuality of proof; (3) logical relationship between original claim and cross-claim. *Id.* at 811–12.

■ Each of these factors is present in St. Kitts's cross-claim. There clearly is a logical relationship between the main claim and the cross-claim because Douglas's liability to St. Kitts is dependent on St. Kitts's liability to plaintiff. Further, there is a significant identity of facts and mutuality of proof, because as a predicate to finding liability on the cross-claim, there must be proof of the facts that establish St. Kitts liability on the main claim. The cross-claim, therefore, is properly asserted under Rule 13(g), and is within the Court's ancillary jurisdiction.

### F. *Plaintiff's Motion to Add a Joint Venture Theory*

Plaintiff has moved to amend the complaint to name additional defendants, and

to add a claim against the new and existing defendants on a joint venture theory. Rule 15(a), Fed.R.Civ.P., governs the amendment of pleadings. Under Rule 15(a), a pleading may be amended once as a matter of course, and after that only with leave of the Court or on consent of the adverse party. The Rule provides that leave to amend "shall be freely given when justice so requires." The current defendants have opposed the motion, arguing that the amendment should be denied because the joint venture claim is meritless.

 The merits of a claim ordinarily are not relevant to a motion to amend. *See Madison Fund, Inc. v. Denison Mines Ltd.*, 90 F.R.D. 89, 91 (S.D.N.Y.1981); *WXIT Television, Inc. v. Meredith Corp.*, 506 F.Supp. 1003, 1010 (N.D.N.Y.1980). When, however, a proposed amendment is clearly frivolous or advances a claim which is legally insufficient on its face, leave to amend should not be granted. *See Demars v. General Dynamics Corp.*, 779 F.2d 95, 99 (1st Cir.1985); *S.S. Silberblatt, Inc. v. East Harlem Pilot Block—Bldg., 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979); *Valdan Sportswear v. Montgomery Ward & Co.*, 591 F.Supp. 1188, 1190 (S.D.N.Y.1984). Defendants' submissions, while demonstrating that there are questions as to their liability on a joint venture theory, have not shown the claim to be clearly meritless. There is significant evidence that all the existing defendants worked together in some degree to achieve the Nigerian crude oil contract, thus, raising the possibility of that they formed a joint venture. Accordingly, the motion to amend the pleading is granted.

Plaintiff has also moved for an order authorizing issuance of process of attachment and garnishment pursuant to § 8 of the Arbitration Act, 9 U.S.C. § 8, and Supplemental Admiralty Rule B(1), attaching all the property of the proposed additional defendants. Rule B(1) requires that the plaintiff's attorney submit an affidavit attesting, to the best of his knowledge, that defendants cannot be found within the district. If, after reviewing the complaint and the affidavit, the Court concludes that plaintiff has asserted an admiralty or maritime claim *in personam*, and that defend-

ants cannot be found within the district, the Court shall issue an order authorizing process of attachment and garnishment.

Plaintiff has complied with these requirements insofar as it seeks an attachment against the following defendants: The First Independent Trust (Curacao) N.V., Irvine Overseas Corporation N.V., Alban Enterprises Corp., Avondale Naqvigation Corp., and Tuborg Corporation. Therefore, process of attachment and garnishment can issue as to them upon filing of the second amended verified complaint. As to defendants Kennedy Simmonds and Michael O. Powell, however, plaintiff has not submitted an affidavit stating that these defendants cannot be found in the district. Accordingly, no attachment and garnishment can issue as to them until plaintiff files an additional affidavit.

### G. Sanctions

Defendants Matthew, de Paulo and Caribbean have moved for attorneys' fees pursuant to Rule 11, Fed.R.Civ.P., on the grounds that plaintiff filed its complaint without basis in law or fact and for the improper purpose of increasing defendants' litigation costs. The disposition of the motions for summary judgment, however, demonstrates that the complaint alleges a sufficient factual basis for plaintiff's claims. Accordingly, the motion for attorneys' fees is denied.

Plaintiff has cross-moved for attorneys' fees under Rule 11. The motion is denied. The record on this motion demonstrates that this case involves a number of difficult questions of fact and law. In light of this record, the Court cannot conclude that the defense's arguments are not well grounded in fact and warranted by existing law, nor can the Court conclude that these arguments were interposed for an improper purpose such as delay.

In support of its motion for attorneys' fees, plaintiff has set out, in great detail, instances in which it claims Matthew and de Paulo have committed perjury. While this may provide a basis for the relief plaintiff seeks, this is a matter of credibility, and as such cannot be determined without

a hearing. If plaintiffs are determined to pursue this remedy, they should raise the matter after the Court has had an opportunity to test the witnesses' credibility at trial.

 Plaintiff has also moved the Court pursuant to Rule 37(d) to preclude defendants from submitting further evidence on the ownership of the funds in the attached account of defendant de Paulo at Banque Paribas, and seeks an order directing that the funds be deemed property of Caribbean. This motion is denied. Rule 37(d) only authorizes sanctions of this type when a party fails to attend a properly noticed deposition, or fails to answer interrogatories or requests for inspection. Plaintiff's motion, however, is based on defendants' allegedly false, vague and evasive answers. Thus, plaintiff has not alleged that defendants have engaged in the specific behavior that Rule 37(d) proscribes.

### III. *Conclusion*

For the foregoing reasons, the motions to dismiss and the motions for sanctions are denied, except that the motion to dismiss the fourth cause of action for fraud is granted. Plaintiff may amend its complaint to cure the deficiencies that the Court has identified in the fourth cause of action.

Plaintiff's motion to amend its complaint to state a cause of action based on a joint venture theory and to add additional defendants is granted. If plaintiff seeks to obtain a Rule B(1) attachment, then upon filing the second amended verified complaint, plaintiff should submit a proposed order authorizing process of attachment and garnishment, as well as an affidavit affirming that *all* the newly joined defendants cannot be found in the district.

The Court will conduct a trial pursuant to § 4 of the Arbitration Act, 9 U.S.C. § 4, to determine which parties are bound by the arbitration agreement, and also to try the claim of fraud. All parties will appear for trial at 10:00 a.m. on February 6, 1989, in the United States Courthouse, Foley Square, New York, New York, Courtroom 618. The Court will hold a pretrial, status conference on July 8, 1988, at 11:00 a.m.,

also in Courtroom 618. All counsel must attend.

SO ORDERED.